**UNITED STATES of America, Plaintiff,**

**v.**

**Victor M. ORENA, Thomas Petrizzo, John T. Orena, Vincent Cascio, Joseph Audino, Paul Bevacqua, Frank Polite and Rocco Miraglia, Jr., Defendants.**

**No. 93 CR 1366 (ERK).**

United States District Court, E.D. New York.

April 26, 1995.

Zachary W. Carter, U.S. Atty., Brooklyn, NY by George Stamboulidis, Ellen Corcella, Jo Anne Weissbart, Asst. U.S. Attys., for plaintiff.

Gerald Shargel, New York City, for Victor M. Orena.

James LaRossa, LaRossa, Mitchell & Ross, New York City, for Thomas Petrizzo.

Alan Futerfas, New York City, for John T. Orena.

James Neville, New York City, for Vincent Casio.

Steve Zissou, Kaye & Zissou, Flushing, NY, for Joseph Audino.

Bettina Schein, New York City, for Paul Bevacqua.

Emmanuel Moore, Hollis, NY, for Frank Polite.

James DiPietro, Brooklyn, NY, for Rocco Miraglia, Jr.

## ORDER

KORMAN, District Judge.

The recommendations of the United States Magistrate Judge are adopted for the reasons stated in his exhaustive Report and Recommendation dated March 31, 1995.

SO ORDERED.

## REPORT AND RECOMMENDATION AND MEMORANDUM AND ORDER

GOLD, United States Magistrate Judge:

The defendants in this case, all alleged to be aligned with the Orena faction of the Colombo Organized Crime family, are charged with conspiracy to murder members of the Persico faction in violation of Title 18, United States Code, Section 1959(a)(5), and with using and carrying firearms during and in relation to crimes of violence in violation of Title 18, United States Code, Section 924(c).

There are several pretrial motions pending. By Order dated February 15, 1995, the Honorable Eugene H. Nickerson, to whom this case was then assigned, referred to me for hearing, if and as required, and report and recommendation defendant Thomas Petrizzo's motion for a taint hearing and defendant Paul Bevacqua's motion to suppress evidence seized from him at the time of his arrest.[1] By Order dated January 27, 1995, the Honorable Edward R. Korman, before whom this case is now pending, referred to me for report and recommendation motions by defendants Victor Orena, John Orena and Joseph Audino to suppress evidence obtained as a result of electronic interceptions of oral communications. Finally, by Order dated March 3, 1995, Judge Korman referred to me a motion by the government to quash certain subpoenas served by the defendants pursuant to Fed.R.Crim.P. 17(c).

## I. PETRIZZO'S MOTION FOR A TAINT HEARING

Defendant Petrizzo seeks a hearing to determine whether search warrants for his home and offices were issued based upon illegal electronic surveillance. For the reasons stated below, I respectfully recommend that Petrizzo's motion for a taint hearing be denied.

The government seeks to introduce at trial certain items seized during searches of defendant Petrizzo's residence and business offices. These searches were conducted pursuant to warrants issued by the United States District Court for the District of New Jersey in November, 1993. The warrant applications were supported by an affidavit submitted by Drucilla L. Wells, a Special Agent of the Federal Bureau of Investigation. The evidence recounted in the Wells affidavit includes conversations overheard during court-authorized electronic surveillance of several telephone lines. Petrizzo's office telephone was one of the lines under surveillance.

---

1. Judge Nickerson's Order also referred certain motions made by defendants Cascio and Miraglia, all of which were rendered moot prior to any further proceedings.

During the course of discovery in this case, defendant Petrizzo requested that the government provide him with all applications and orders authorizing the electronic surveillance described in the Wells affidavit. Defendant Petrizzo also asked the prosecution to produce tape recordings of all conversations intercepted pursuant to those electronic surveillance orders. The government provided the applications and orders to Petrizzo, but declined to comply with Petrizzo's request to produce the tape recordings of the intercepted conversations. The government justified this denial on the grounds that it did not intend to offer any of the intercepted conversations into evidence at trial, and that it would ask the Court to review whether the Wells affidavit recounts evidence sufficient to establish probable cause without reference to the electronic surveillance evidence which it describes.[2] Defendant Petrizzo did not move to compel discovery of the tape recordings in issue.

By letter motion dated February 15, 1995, defendant Petrizzo seeks a hearing to determine whether the evidence described in the Wells affidavit was tainted by illegal electronic surveillance. Petrizzo reasons that, because the government has declined to comply with his request to produce the tapes recorded pursuant to the electronic surveillance orders, he has been deprived of his right to test the legality of the electronic surveillance. Therefore, Petrizzo contends, the Court must presume that the electronic surveillance was illegal and should be suppressed. Petrizzo further argues that, because the electronic surveillance should be treated as if suppressed, he is entitled to a hearing to determine whether any other evidence recounted in the Wells affidavit is derived from the presumptively illegal electronic surveillance.

**2.** As discussed in greater detail below, the government is required by statute to provide a defendant with the applicable court order and application before offering the contents of any intercepted conversation or evidence derived therefrom at a trial or hearing. 18 U.S.C. § 2518(9). The government failed to comply with this provision before offering evidence seized pursuant to the District of New Jersey search warrants at Petrizzo's detention hearing. This statutory violation

## A. Failure to Produce Tapes of Intercepted Conversations Does Not Give Rise to a Presumption of Illegality

■ As noted above, Petrizzo asks the Court to presume that the electronic surveillance described in the Wells affidavit was conducted illegally because the government has decided not to produce tape recordings of the intercepted conversations. Petrizzo asserts that the fruits of this electronic surveillance should therefore be suppressed. Petrizzo cites no authority for the proposition, however, that he is entitled to discovery of all tapes recorded during the electronic surveillance described in the Wells affidavit.

The statutes governing electronic surveillance directly address the scope of discovery required before the government may offer intercepted communications or evidence derived from those communications in evidence. Title 18, United States Code, Section 2518(9) requires only that a defendant be furnished with "a copy of the court order, and accompanying application, under which the interception was authorized or approved." There is no statutory requirement that all recordings made pursuant to the court order be produced. To the contrary, Section 2518(10)(a) specifically provides that it rests within the discretion of the trial court to decide whether intercepted communications should be furnished to a defendant.

As noted above, the government has complied with the disclosure requirements of Section 2518(9). Defendant Petrizzo has been supplied with the applications and orders authorizing electronic surveillance. Moreover, he has never asked the court to exercise its discretion to order production of all or any of the intercepted communications described in the Wells affidavit. Thus, there is no basis to presume that the intercepted

has been the subject of lengthy proceedings in this case. Some time well after Petrizzo's detention hearing took place, the government provided defendant Petrizzo with redacted copies of the applications and court orders authorizing the electronic surveillance, and subsequently produced unredacted versions. *See* Gov't's Letter of March 13, 1995, submitted in opposition to Petrizzo's motion for taint hearing.

conversations described in the Wells affidavit were illegally obtained.

Petrizzo argues that suppression should nevertheless be presumed because, without access to the tape recordings he seeks, he has been deprived of the means with which to test the legality of the electronic surveillance. Equipped with the orders and applications, however, Petrizzo has been armed with all materials required to contest whether the constitutional and statutory requirements for electronic surveillance have been met. Petrizzo has not moved to suppress based upon the inadequacy of the applications or the illegality of the orders authorizing the electronic surveillance described in the Wells affidavit, nor has he even contended that the authorizing orders were improperly issued.

Petrizzo contends that, even with access to the applications and orders, he is unable to challenge the legality of the electronic surveillance for failure to minimize without access to the tapes. See 18 U.S.C. § 2518(5). Having been provided with the applications and orders, however, Petrizzo is able to compare the scope of the interceptions authorized by the Court with those described in the Wells affidavit. Moreover, although neither the Supreme Court nor the Second Circuit has squarely addressed this issue, several courts have held that a failure to minimize interceptions requires suppression only of the unauthorized interceptions and not of all conversations—much less the fruits of all conversations—overheard pursuant to the court-authorized surveillance. See, e.g., United States v. Hoffman, 832 F.2d 1299, 1307–1309 (1st Cir.1987); United States v. Dorfman, 542 F.Supp. 345, 394 (N.D.Ill.1982) (collecting cases); United States v. Mainello, 345 F.Supp. 863, 877 (E.D.N.Y.1972). But see Scott v. United States, 436 U.S. 128, 135 n. 10, 98 S.Ct. 1717, 1722 n. 10, 56 L.Ed.2d 168 (1978); United States v. Principie, 531 F.2d 1132, 1139–1141 (2d Cir.1976); cert. denied, 430 U.S. 905, 97 S.Ct. 1173, 1174, 51 L.Ed.2d 581 (1977).

▉ It is also noteworthy that Petrizzo would not have standing to bring a minimization challenge with respect to the vast majority of intercepted conversations recounted in the Wells affidavit. The conversations described in the Wells affidavit resulted primarily from two wiretaps. One, referred to as the "Ross" wiretap, was a tap of Petrizzo's office telephone. Wells Aff., ¶ 6. The other, however, referred to as the "Flagship" wiretap, was a tap of telephones at the offices of a business run by George Patunas, another target of the New Jersey investigation. Wells Aff., ¶ 26. The vast majority of the intercepted conversations described in the Wells affidavit, and the interceptions which revealed the most compelling evidence of criminality, were the product of the Flagship wiretap. Wells Aff., ¶¶ 36–53. A minimization challenge may be brought, however, only by a party with a privacy interest in the "bugged" premises or telephone line. See, e.g., United States v. Bianco, 998 F.2d 1112, 1122 (2d Cir.1992); United States v. Poeta, 455 F.2d 117, 122 (2d Cir.1972); United States v. Moore, 811 F.Supp. 112, 118 (W.D.N.Y.1992); United States v. Rodriguez, 734 F.Supp. 116, 122–123 (S.D.N.Y.1990). See also Alderman v. United States, 394 U.S. 165, 175, 89 S.Ct. 961, 968, 22 L.Ed.2d 176 (1969). Petrizzo did not have a privacy interest in the "Flagship" telephones, and therefore would have no standing to seek suppression for failure to minimize conversations overheard on those lines.

Defendant Petrizzo's reliance on United States v. Huss, 482 F.2d 38 (2d Cir.1973), for the proposition that suppression should be presumed when tapes are not provided to the defense is misplaced. The district court in Huss had found a witness in contempt for refusing to answer questions after being granted immunity. The witness contended that he was pressured into becoming a government informant only after several violations of his rights, including having been confronted with the fruits of an illegal wiretap of his home. The government conceded that the wiretap had taken place, that it had been conducted without court authorization and contrary to law, and that all tapes recorded during this illegal wiretap had been destroyed. Reviewing the record of a taint hearing conducted by the district court, the Second Circuit held on these facts that the government had failed to establish that the

basis for its questioning of the witness was sufficiently free of taint for the contempt finding to stand.

*Huss* is distinguishable from this case because the electronic surveillance in *Huss* was never authorized by any court, and the government was forced to acknowledge that it had been conducted unconstitutionally and illegally. Suppression in *Huss* was not "presumed," but required as a matter of course. Moreover, the defendant in *Huss* established a direct connection between the fruits of the illegally conducted electronic surveillance and the testimony of the witness in issue. Here, in contrast, the wiretaps in issue were authorized by the court pursuant to applications and orders which have been provided to Petrizzo, and Petrizzo has thus been afforded the opportunity to challenge the legality of the surveillance. Moreover, any connection between the results of the surveillance of Petrizzo's office telephones and the remaining evidence recounted in the Wells affidavit is mere speculation. Accordingly, although Petrizzo has not been provided with tape recordings of the conversations intercepted by the government, *Huss* does not mandate a taint hearing.

Finally, as noted above, Petrizzo failed to move to compel production of the tape recordings in issue in a timely manner. By Order dated April 1, 1994, pre-trial motions in this case were to made returnable no later than July 28, 1994. Although a substantial number of motions were timely filed in this case, Petrizzo did not move for discovery of recordings of the intercepted conversations. Rather, Petrizzo waited to bring this motion until the scheduled trial date of this case was less than seven weeks away and more than six months had passed since the deadline for filing pretrial motions. Moreover, Petrizzo does not now seek to compel production of the tapes but instead, relying on the government's decision not to produce the recordings in discovery, asserts that he is entitled to a taint hearing. Indeed, during the course of oral argument, Petrizzo's counsel explicitly stated that he did not now seek production of

the recorded interceptions; rather, he argued that the government, having decided not to produce the recordings, was now obliged to go forward with a taint hearing.[3] Under these circumstances, it is difficult to avoid the conclusion that Petrizzo decided against moving to compel production of the recordings as part of a deliberate strategy designed to create the circumstances which give rise to this motion.

In short, there is no requirement that the government, under the circumstances presented by this case, produce recordings of intercepted conversations. Although the court has discretion to require production of intercepted communications, Petrizzo failed to move to compel discovery of these materials within the ample time provided. Accordingly, the presumption of illegality upon which Petrizzo's motion for a taint hearing rests in unfounded.

### B. *The Wells Affidavit Establishes Probable Cause*

■ Even assuming for purposes of argument that the electronic surveillance described in the Wells affidavit should be presumed illegal and therefore suppressed, it is proper for the Court to review the affidavit to determine whether the remaining evidence recounted in it states sufficient probable cause to justify the issuance of the search warrants for Petrizzo's home and office. *See, e.g., Laaman v. United States,* 973 F.2d 107, 115 (2d Cir.1992); *cert. denied,* —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *United States v. Taborda,* 635 F.2d 131, 140–141 (2d Cir.1980). The Wells affidavit sought warrants to search for evidence of fraud, extortion and bribery in connection with Petrizzo's operation of various related construction companies. Information from a variety of sources apart from electronically intercepted conversations is set forth in the affidavit. Petrizzo does not argue that this remaining evidence is insufficient to establish probable cause, nor could he.

Some of the information recounted in the Wells affidavit is attributed to identified

---

**3.** *See* Tr. at 34–35, 38 (references are to the transcript of oral argument held on March 15, 1995, unless otherwise indicated).

sources. Alphonse D'Arco, an acting boss of the Lucchese organized crime family, described Petrizzo as a Colombo family "capo" who specialized in labor racketeering. According to D'Arco, Petrizzo used his organized crime influence to obtain contracts and preferential union agreements for his construction companies. *Wells Aff.*, ¶¶ 16–18. This information was corroborated in large part by Salvatore Gravano, an underboss of the Gambino crime family who, like D'Arco, has since become a government witness. *Wells Aff.*, ¶ 19.

In addition, the Wells affidavit describes information provided to law enforcement officers by various unidentified informants. One of these informants, described as "Source Three," had at the time of the Wells affidavit been cooperating with the government for four years and provided information which had been corroborated by other sources. Like D'Arco and Gravano, Source Three identified Petrizzo as "captain" in the Colombo organized crime family who used that position to engage in racketeering in the construction industry. *Wells Aff.*, ¶ 22 at n. 24, ¶ 24.

Two additional informants, described in the affidavit as "Source Two" and "Source Ten," had no criminal involvement and voluntarily provided information to the government. *Wells Aff.*, ¶ 12 at n. 13, ¶ 54. Source Two described, in essence, how Petrizzo received substantial payments, under suspicious circumstances, from a company awarded a contract to build a monorail at Newark Airport. Petrizzo agreed in return for these payments to exercise his influence over various unions to ensure completion of the project on time and within budget. *Wells Aff.*, ¶¶ 12–15. Source Ten stated that Petrizzo achieved enormous business success by using his organized crime connections to dictate terms to concrete contractors and unions. *Wells Aff.*, ¶ 54.

Finally, an informant described in the affidavit as "Source One," whose information has been corroborated by independent means, stated that a company controlled by Petrizzo engaged in a fraudulent scheme to obtain government contracts set aside for women and minorities. *Wells Aff.*, ¶ 3 at n. 1, ¶ 11. Source One also described how Petrizzo secretly removed assets from one of his businesses by means of a scheme involving fraudulent invoices. The business subsequently filed for protection under the bankruptcy laws. According to Source One, these fraudulent transactions are recorded in the books and records of the business involved. *Wells Aff.*, ¶ 58. Source One further reported that Petrizzo also used bogus invoices to inflate the receivables of one his businesses, thereby inducing a bank to extend a line of credit to the business, and that documents reflecting these receivables had been in the Petrizzo's business offices. *Wells Aff.*, ¶¶ 59–60, ¶ 60 at n. 41. Some of the information attributed to Source One has been corroborated, at least in part, by documentary evidence. *Wells Aff.*, ¶ 11 at n. 11, ¶ 14 at n. 17.

This evidence, which is merely summarized here in a general way, clearly provided the issuing Magistrate Judge with a substantial basis for concluding that the warrants sought were supported by probable cause. Accordingly, I respectfully recommend that defendant Petrizzo's motion for a taint hearing be denied.

## II. MOTION TO SUPPRESS THE "AUDINO ROVING BUG" TAPES

By Order dated January 17, 1992, the Honorable Eugene H. Nickerson authorized the government to intercept and record oral communications of Victor J. Orena, Victor M. Orena, Joseph Audino and Vincent Cascio in various vehicles for a period of thirty days. *Shargel Aff.*, Ex. C (June 20, 1994). In issuing the Order, Judge Nickerson found probable cause to believe that these individuals would discuss the commission of various offenses, including attempted murder and murder for the purpose of maintaining and increasing their position in a racketeering enterprise, as well as a number of offenses which can be described generally as involving extortionate extensions of credit or "loansharking."[4] This Order of authorization was renewed and extended for an additional thir-

---

4. The specific offenses enumerated in the order of authorization are violations of 18 U.S.C. §§ 892, 893, 894, 1951, 1956, 1959(a) and 1962(a), (c) and (d).

ty days on February 25, 1992. *Shargel Aff.*, Ex. G.

Defendants Victor M. Orena and John Orena have moved to suppress the conversations intercepted pursuant to the orders of authorization issued by Judge Nickerson, and defendants Joseph Audino and Vincent Cascio have joined in the motion. In support of their motion, these defendants argue that the orders were not supported by probable cause, that the government failed to establish an adequate basis to support authorization for a "roving bug" which could be placed in several different vehicles, that the government did not adequately demonstrate the unavailability or impracticality of alternative investigative means, and that the government failed to seal the tapes recorded pursuant to the orders as promptly as required by law.[5]

### A. Sufficiency of Showing of Probable Cause

The original application for the Audino "roving bug" was supported by the affidavit of Federal Bureau of Investigation Special Agent Joseph Fanning (the "Fanning Affidavit").[6] Relying on background intelligence information, the Fanning affidavit states that Victor J. Orena is an "acting boss" of the Colombo organized crime family. The affidavit identifies Victor M. Orena as the son of Victor J. Orena and a captain in the family, and Audino and Cascio as "made members" of the Colombo family associated with the Orena faction. *Fanning Aff.*, ¶¶ 17–18. The affidavit describes an ongoing battle for control of the family between the Orena faction and a competing group allied with Carmine Persico, and states that six murders and five attempted murders have been perpetrated in furtherance of this battle. According to Fanning, three Persico faction members and two Orena faction members were killed during the two months immediately preceding the date of the affidavit. *Fanning Aff.*, ¶ 16. This rift is specifically described by an infor-

mant referred to as CS–7, a former acting boss of the Lucchese family who has since entered into a cooperation agreement with the Government. CS–7, who asserts that he has been a passenger in a vehicle used by Victor J. Orena, also reported that Victor M. Orena has become increasingly involved in his father's criminal activities and spends a good deal of time with his father during the day. *Fanning Aff.*, ¶ 88.

The evidence of loansharking presented in the Fanning affidavit is extensive, and includes a detailed description of the dealings between James Hankoff, who began cooperating with the government in 1989, and Lawrence Lombardo, an "associate" of the Colombo family. These dealings included various loansharking arrangements, pursuant to which Hankoff borrowed money from Lombardo at very high rates of interest and at least one occasion on which Lombardo referred to breaking the legs of borrowers who missed payments. *Fanning Aff.*, ¶¶ 29 *et seq.*, and especially at ¶ 41. Hankoff agreed to record many of his meetings with Lombardo, which are described in the Fanning affidavit as having taken place between 1987 and June, 1991. On more than one occasion, Lombardo told Hankoff in essence that he was working as a loanshark for Victor J. Orena, and at least some of these conversations were recorded on tape. *Fanning Aff.*, ¶¶ 31, 42, 47, 49–51.

The loansharking information provided by Hankoff is corroborated not only by the recordings he made but also by information provided by several confidential informants. One informant, identified as CS–1, reported to federal officials that Victor J. Orena controls a large loansharking operation which his sons, Victor M. and John Orena, help manage. *Fanning Aff.*, ¶¶ 36–37. Like Hankoff, CS–1 agreed to record many of his/her criminal conversations, most of which were with John Orena. In one recorded

---

**5.** In their original memorandum of law, defendants Victor and John Orena also reserved their right to challenge whether the government properly minimized interceptions as required by Judge Nickerson's orders because they had not yet been provided with certain surveillance logs. The defendants have since received these logs, however, and have not renewed this aspect of

their suppression motion. *See* Gov't's Mem. Opp.Defs.' Pretrial Mot. at 61.

**6.** The Fanning affidavit submitted in support of the original authorization order is annexed as Exhibit B to the Shargel affidavit.

conversation held in January, 1991, John Orena implicated his father (Victor J. Orena) and brother (Victor M. Orena) in loansharking activities, and stated that his father had agreed to lend CS-1 $40,000 at three per cent interest per week because "we're starting to build up again." *Fanning Aff.*, ¶¶ 44–46. According to CS-1, s/he collected over one million dollars in loanshark payments on behalf of Victor Orena in a three year period, including $350,000 in interest during 1990 alone. *Fanning Aff.*, ¶ 71. A second informant, described as CS-2, told FBI agents in September of 1991 that s/he is associated with Joseph Audino, and knows from personal observations that Audino is a loanshark and driver working for Victor M. Orena. *Fanning Aff.*, ¶ 53. Yet another informant, referred to as CS-4, advised the FBI in October, 1991 that Victor J. Orena ran a large money laundering operation and purchased several businesses with funds obtained from illegal gambling, loansharking and bootleg gasoline transactions. CS-4 based this information upon personal knowledge derived from hearing conversations between Victor J. Orena and his associates. *Fanning Aff.*, ¶ 71A.

Other informants implicate the Orena crew in additional criminal activity. An informant referred to as CS-5, for example, agreed to record his/her meetings with an individual named Frank D'Amico. In meetings held in late 1990 and early 1991, D'Amico described himself as an associate of Victor J. Orena, and stated that he launders money for Orena. *Fanning Aff.*, ¶¶ 55–64. As another example, informants CS-3 and CS-4 reported that Joseph Audino collected money generated by illegal gasoline transactions on behalf of the Orenas. *Fanning Aff.*, ¶¶ 85–86.

In addition to the information described above concerning the participation of Victor J. Orena, Victor M. Orena and Joseph Audino in the criminal activities enumerated in the government's electronic surveillance application, the Fanning affidavit also describes evidence showing that there would be conversations about these criminal activities in various vehicles used by the Orenas, Audino and Cascio. First, CS-2 reported to FBI agents in September of 1991 that Joseph Audino is a driver for Victor M. Orena and that Audino and Orena discuss loansharking and other criminal activities while driving together. *Fanning Aff.*, ¶ 53. CS-2, a close associate of many members of organized crime, had been a government informant for five years at the time of the Fanning affidavit, and had previously provided information proven to be reliable. For example, CS-2 provided the government with information which led directly to the location and arrest of a Colombo family member who was at that time a fugitive. *Fanning Aff.*, ¶ 24. CS-4, who began cooperating with the government in June of 1991, similarly stated that Audino and Victor M. Orena regularly discuss loansharking and bootleg gasoline business while driving together. *Fanning Aff.*, ¶¶ 26, 87. Finally, CS-7, whose background is described above, advised the FBI in November of 1991 that s/he had conversations during the prior year with Victor J. Orena about criminal activities while a passenger in vehicles used by Orena. *Fanning Aff.*, ¶ 88.

The Fanning affidavit also details physical surveillance conducted by the FBI throughout 1991. Joseph Audino and Victor M. Orena were seen driving together on numerous occasions and were also seen from time to time in various combinations with Vincent Cascio, Victor J. Orena and John T. Orena, as well as others. *Fanning Aff.*, ¶¶ 89 *et seq.* One particular occasion involved circumstances which appear to corroborate the confidential informants who assert that the Orenas and Audino use their cars to conduct conversations about crimes. On February 25, 1991, agents saw Audino, Victor M. Orena and a third individual identified as a gasoline bootlegger all enter the same restaurant. At about 3:02 p.m., all three individuals exited the restaurant and drove away in separate cars. Three minutes later, however, Audino parked the car he was driving and entered the car being driven by Orena. Audino and Orena then drove off together, but appeared to be travelling slowly and aimlessly for approximately twenty minutes. *Fanning Aff.*, ¶ 91. On another occasion, in July, 1991, Larry Lombardo, who, as discussed above, has been linked by means of informant information and consensually recorded conversations to Victor J. Orena's loansharking opera-

tion, was seen entering Victor M. Orena's automobile. *Fanning Aff.*, ¶ 100. Finally, the Orenas, Audino and Cascio were observed using counter-surveillance driving techniques on at least two occasions. *Fanning Aff.*, ¶¶ 93, 109, 111a.

On February 24, 1992, the government applied for a renewal order allowing it to continue intercepting oral communications for a second thirty-day period. Agent Fanning submitted a second affidavit in support of this application (the "Second Fanning Affidavit"). The Second Fanning Affidavit, in addition to reiterating much of the information in the first affidavit, summarized the interceptions which had taken place since the original authorization Order was issued. The conversations intercepted revealed that the parties speaking were concerned that they were being surveilled by law enforcement officers. *Second Fanning Aff.*, ¶¶ 16, 18, 20, 21, 24, 26, 27. During one particular intercepted conversation, there was discussion about weapons, "watch[ing] out for the rebels" (presumably a reference to members of the Persico faction) and the safety of a particular location. In another, the topics discussed included a shooting from a car and how "Vic" had become the "boss" and would step down if asked. *Second Fanning Aff.*, ¶¶ 20, 28. During another intercepted conversation, Audino discussed credit being extended, the need for an unidentified third party to come up with money, and gasoline missing from a terminal. *Second Fanning Aff.*, ¶ 25.

■ In deciding whether the government has established probable cause to support the issuance of a warrant or order authorizing electronic interception, the task of the judicial officer

is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found.

*Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). *See also United States v. Gallo*, 863 F.2d 185, 191 (2d Cir.1988), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989) (holding that the standard of probable cause governing electronic surveillance is the same as for any other search warrant). Moreover, the decision of a court that there is probable cause to issue an order authorizing electronic surveillance is entitled to substantial deference, and a motion to suppress does not prompt *de novo* review. Rather, the question raised by a motion to suppress is whether the issuing court had a "substantial basis" for concluding that probable cause existed. *United States v. Gotti*, 771 F.Supp. 535, 541 (E.D.N.Y.1991). *See also United States v. Gallo*, 863 F.2d at 191; *United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir.1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *United States v. Nersesian*, 824 F.2d 1294, 1306 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).[7]

■ Defendants Victor M. Orena and John T. Orena challenge the sufficiency of the evidence presented in the Fanning affidavit primarily by arguing that the informants relied upon by Fanning are not shown in the affidavit to be reliable. In addition, these defendants argue that the evidence recounted in the Fanning affidavit is too stale to

---

7. In *Leon v. United States*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court adopted a "good-faith" exception to the exclusionary rule and held that evidence should not be suppressed if obtained in objectively reasonable reliance on a search warrant, even if the warrant is subsequently found to have been invalidly issued. Some courts have applied this holding to orders authorizing electronic surveillance. *See United States v. Moore*, 41 F.3d 370, 376 (8th Cir.1994); *United States v. Milan–Colon*, 1992 WL 236218, at *8, 15 (S.D.N.Y.1992); *United States v. Gambino*, 741 F.Supp. 412, 415

(S.D.N.Y.1990). *See also United States v. Ojeda Rios*, 875 F.2d 17, 23 (2d Cir.1989), *cert. granted*, 493 U.S. 889, 110 S.Ct. 231, 107 L.Ed.2d 183 (1989), *judg. vacated*, 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990) (suggesting that the application of *Leon* "might be justified in the case of section 2518(10)(a)"). *But see United States v. McGuinness*, 764 F.Supp. 888, 897 n. 2 (S.D.N.Y.1991) (stating that "[i]t is doubtful ... whether the *Leon* exception applies to wiretaps, since the exclusionary rule for wiretaps is explicitly commanded by statute").

justify the issuance of an order authorizing electronic surveillance.

As the above summary of the Fanning affidavit makes plain, however, Judge Nickerson clearly had a substantial basis to conclude that the Orenas, Cascio and Audino would be discussing criminal activity in various automobiles. First, the Fanning affidavit sets forth objective evidence to support the reliability of at least some of the informants upon which it relies. Hankoff, for example, is identified by name, had been cooperating for more than two years, and consensually recorded more than one hundred conversations. *Fanning Aff.,* ¶¶ 20–22. CS–1 had been cooperating for more than a year and had recorded numerous conversations with Victor M. Orena and John T. Orena, and provided information in support of two search warrants which yielded positive results. *Fanning Aff.,* ¶ 23. CS–2, a government informant for five years at the time of the Fanning affidavit, provided information which led directly to the arrest of a fugitive who was a member of the Colombo family. *Fanning Aff.,* ¶ 24. CS–5 and CS–6 agreed to make recordings of their conversations, and these recordings corroborated information they provided to the FBI. *Fanning Aff.,* ¶¶ 26a–26b.

■ Furthermore, even assuming for purposes of argument that each informant, standing alone, was not shown in the Fanning affidavit to be sufficiently reliable to establish probable cause, these informants are corroborated both by each other and by independent evidence. CS–7, who reported information concerning the violence perpetrated in furtherance of the battle for control of the Colombo crime family, is corroborated by the slew of murders of persons known to be family members committed during the two months prior to the warrant application. These murders, moreover, demonstrate that the evidence presented in the affidavit, at least with respect to the 18 U.S.C. § 1959 offenses, was by no means stale.

The evidence of loansharking and money laundering—crimes which common sense indicates are frequently committed together as part of one criminal scheme—comes from several independent sources. Hankoff, CS–1, CS–2 and CS–4 each asserted to the FBI that the Orenas and those working for them were involved in loansharking, and Hankoff and CS–1 agreed to record conversations with Lawrence Lombardo and John T. Orena, respectively, which confirm this information. CS–5, an informant who also made recordings which corroborate his information, reported that Victor J. Orena had people working to launder money for him. Two informants, CS–3 and CS–4, told FBI agents about Audino's collecting the proceeds of criminality involving bootleg gasoline for the Orenas.

Defendant's assertion that the government's information about loansharking and related offenses was stale is also without merit. Hankoff and CS–1 made their recorded conversations during the first part of 1991, less than one year prior to the application for the "Audino bug." CS–2 and CS–4 provided their information to the FBI in September and October of 1991, respectively, just months before the Fanning affidavit was prepared. Moreover, according to CS–1, s/he collected enormous sums of money owed on illegal loans made by the Orenas, and it is reasonable to infer that an operation so substantial is an ongoing one. Finally, in a recording made in January of 1991, John T. Orena told CS–1 that he, his father and his brother were "starting to build up again," which clearly suggests an effort to maintain and develop an ongoing criminal enterprise.

■ Defendants also contend that the Second Fanning Affidavit does not set forth sufficient probable cause to warrant extending the initial authorization Order. As discussed above, however, conversations were intercepted during the first authorized surveillance period involving extensions of credit, the need to make prompt repayment of borrowed sums, missing gasoline, weapons, a shooting from a car, the safety of a particular location, the status of "Vic" as the boss, and repeated concerns about law enforcement surveillance.

Defendants argue primarily that the reference to gasoline is too ambiguous to support an inference of criminality, and that the intercepted conversations about law enforce-

ment surveillance are irrelevant to probable cause because anyone being followed by federal agents would be similarly concerned. Read in context, however, the recorded discussions about being followed are persuasive evidence of consciousness of guilt and ongoing criminality. For example, in a conversation intercepted on February 17, 1992, Audino was overheard saying, in the presence of Cascio and others, "put it where you can get it. This way we throw 'em out if they, if they stop us." *Second Fanning Aff.*, ¶ 18. Similarly, on February 8, 1992, John Orena·was heard saying to Audino, "Good thing we spotted him," to which Audino replied, "He wanted to send Schwartzie [according to the government, a reference to Cascio] home with a bazooka." *Second Fanning Aff.*, ¶ 26. In another conversation intercepted that day, Audino, in the course of conversation with John Orena and Victor M. Orena, said, "They search the car. That's why you can't, ah do nothing … You can't carry no [expletive deleted]. You wind up in the [expletive deleted] can." *Second Fanning Aff.*, ¶ 27. Even assuming the discussion of gasoline is, as defendants assert, too ambiguous to support a finding of probable cause, the remaining intercepted conversations described above provided Judge Nickerson with a more than ample basis for issuing the renewal Order.

### B. *Sufficiency of Showing in Support of a "Roving Bug"*

■ The Orders authorizing electronic surveillance issued by Judge Nickerson permitted the government to employ a "roving bug" and to intercept communications occurring in various and changing vehicles. Section 2518(11)(a) of Title 18 requires that the place where communications are to be intercepted be specified in an application to intercept oral communications, unless the application contains a full and complete statement explaining why such specification is not practical, and the judge so finds.

■ Defendants contend that the Fanning affidavit contains an inadequate basis to support Judge Nickerson's finding of imprac-

ticality. However, although defendants assert that the Fanning affidavit states that the Orenas continuously used a single vehicle during December of 1991 and through January 17, 1992 (the date of the affidavit), the surveillance reported in the affidavit establishes that the Orenas, Cascio and Audino were seen driving or riding in two different Pontiac Bonnevilles, a red Lincoln and a Black Chevrolet during this period of approximately six weeks. *Fanning Aff.*, ¶¶ 111a, 111c, 111h. Defendants also assert that, because several of the cars involved belonged to relatives of the Orenas, and because at least two of the cars were the same make, model and color, it is illogical to conclude that the change in automobiles was part of a scheme to deceive or hide from law enforcement.[8] Section 2518(11)(a), however, does not require a showing that the impracticality of specifying a single place at which oral communications are to be intercepted stems from a target's intent to avoid interception. *Cf.* Section 2518(11)(b); *United States v. Bianco*, 998 F.2d 1112, 1123 (2d Cir.1993).

Indeed, the Fanning affidavit clearly sets forth how both informant information and surveillance by law enforcement officers established that the Orenas, Cascio and Audino used a variety of automobiles during 1991. Victor M. Orena used five different automobiles on a regular basis during the thirteen months prior to the application to conduct electronic surveillance. *Fanning Aff.*, ¶ 7a. At least one informant advised the FBI that Victor J. Orena and Audino were likely to switch cars at any time because they feared assassination. *Fanning Aff.*, ¶ 109a. This use of several different vehicles during a short time span was confirmed by means of physical surveillance by law enforcement officers, and is consistent with the government's allegation that members of the Orena faction were seeking to avoid easy detection because of the then ongoing battle for control of the Colombo family. Moreover, the information presented in the affidavit concerning the violent battle suggests that this practice was likely to continue and quite possibly intensify. Accordingly, the government provided

---

8. At least two of the automobiles used by the Orenas during 1991 and 1992 were registered in the names of business entities. *Fanning Aff.*, ¶ 7a.

Judge Nickerson with a sufficient basis to find that it was not practical to identify a specific automobile in which the conversations sought to be intercepted would occur. Defendants' challenge pursuant to Section 2518(11) should, therefore, be rejected.

### C. Availability of Alternative Investigative Means

 Defendants next assert that the communications intercepted by the government should be suppressed because the Fanning affidavit failed to present a factual basis sufficient to support a finding that the government had exhausted all available alternative investigative methods. Section 2518(3)(c) provides that an order authorizing the interception of oral communications may be entered only if the issuing judge first determines on the basis of facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or be too dangerous." The purpose of this provision is not to preclude the use of electronic surveillance until every other conceivable means of investigation has been tried and failed, but instead to require the government to demonstrate that normal investigative methods pose difficulties. Whether the required showing has been made should be determined in a common sense, practical fashion, and a finding by the issuing judge that no alternative investigative means are reasonably available is entitled to deference. *See United States v. Gotti*, 771 F.Supp. 535, 546 (E.D.N.Y.1991) (citing *United States v. Martino*, 664 F.2d 860, 868 (2d Cir.1981), *cert. denied sub nom. Miller v. United States*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982)). *See also United States v. Torres*, 901 F.2d 205, 231 (2d Cir.), *cert. denied sub nom. Cruz v. United States*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Wilkinson*, 754 F.2d 1427, 1433 (2d Cir.), *cert. denied sub nom.*

*Shipp v. United States*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

 In their original moving papers, defendants argued that the government failed to make the showing required by Section 2518(3)(c) because it had available the eight informants (Hankoff and CS–1 through CS–7) described in the affidavit itself and discussed above. The Fanning affidavit demonstrates, however, that while the government did have several informants, it was not practical to develop detailed information about ongoing criminal activity from them. By the time of the affidavit, for example, Hankoff and CS–1 had entered the Witness Protection Program and been relocated, and CS–7 was in federal custody and making plans to enter the Witness Protection Program. *Fanning Aff.*, ¶¶ 26c, 115. CS–2 and CS–4 apparently provided the government with information only on the condition that they not be called upon to testify.[9] *Fanning Aff.*, ¶¶ 24, 26. CS–3, who began cooperating with the government in 1989, is described as an individual who *was* a business and criminal associate of Victor M. Orena for approximately one year. *Fanning Aff.*, ¶ 25. CS–5 and CS–6, while friendly with an associate of Victor J. Orena, are not described as having had direct contact with the Orenas or Audino or Cascio. *Fanning Aff.*, ¶¶ 26a, 26b. Clearly, Judge Nickerson could reasonably have inferred from these facts that none of the informants described in the Fanning affidavit was in a position to have discussions with the Orenas, Audino or Cascio about the full scope of the ongoing criminal activity described in the interception application.

During oral argument and in a letter filed after their motion had been fully briefed, defendants added to their argument an application for a hearing to determine whether in fact alternative investigative means were available to the government but not described by Agent Fanning in his affidavit.[10] In an attempt to make a *prima facie* showing in support of this application, defendants

---

**9.** The refusal of a witness to testify is properly considered by the issuing judicial officer in determining the availability of alternative investigative means. *See, e.g., United States v. Leisure*, 844 F.2d 1347 (8th Cir.), *cert. denied*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); *United*

*States v. Wilkinson*, 754 F.2d at 1434; *United States v. Gotti*, 771 F.Supp. at 546–547.

**10.** *See* Letter from Jeffrey Lichtman, Esq., to the Court, dated February 27, 1995.

point to two documents—one discussed in their letter and another mentioned for the first time at oral argument on March 15, 1995—which they had received from the government in discovery. Defendants contend that these documents suggest that additional informants with the ability to provide detailed ongoing information about the activities of the Orenas and their close associates were available to the prosecution at the time of the Fanning affidavit.

Defendants first rely upon an investigative report of an interview with an individual named Lawrence Mazza. This report recounts information provided by Mazza about Gregory Scarpa, who was then himself cooperating with the government. According to the report, Mazza told the FBI that Scarpa had two sources of information, one of whom was a law enforcement officer and another who was a member of the Orena faction. Mazza reported that Scarpa was able, through these sources, to learn the address of Victor J. Orena's girlfriend. This suggests, according to defendants, that Scarpa's source in the Orena faction had access to information which only individuals very close to the Orenas would know. Because Scarpa was cooperating with the government at the time of the Fanning affidavit, defendants reason that the government had indirect access to Scarpa's Orena faction source.

Even if defendants' reading of the interview report is accurate, the government's indirect access to an Orena source, through Scarpa, is hardly a practical means for investigating ongoing criminal activity. Moreover, in a letter dated March 13, 1995, the government points out that Agent Fanning testified in *United States v. Cutolo* that he was unaware of any information provided to the government by Scarpa. Finally, the government represented at oral argument that the Mazza interview in question took place some time after January of 1994, demonstrating that the interview report provides no basis to believe that the government knew of any Orena faction source available to Scarpa

before the application for the roving bug was made.[11]

Defendants next point to two search warrant affidavits prepared by Agent Fanning in March of 1992 in which two confidential sources are described.[12] Defendants seek a hearing to explore whether these sources were available to Fanning in January of 1992 and, if so, why the government's access to them did not constitute a reasonable alternative means of investigation. Defendants emphasize that the search warrant affidavits express concern that one of the informants would be put in danger if the search were conducted within ten days, further suggesting that the informant must have been quite close to the Orenas.

A close reading of the search warrant affidavits, however, does not support defendants' position. The only information attributed to the two sources in question concerning the Orenas, Cascio or Audino is the name and address of Victor J. Orena's girlfriend and the fact that Orena was at the time residing with her. The affidavits do not indicate how these informants came to know this information, or whether they were at the time in contact with any of the Orenas. In an affidavit submitted after the oral argument on the pending motions, moreover, Agent Fanning states that the two informants referred to in the search warrant affidavits are among the seven unidentified informants described in the affidavit he submitted in support of the application to intercept oral communications.[13] Several of those informants might well have heard about Orena's decision to live with his girlfriend, yet their availability to the government would nevertheless not constitute an available alternative investigative method for the reasons described above.

Defendants point to the decision in *United States v. Lilla*, 699 F.2d 99 (2d Cir.1983), as an example of the willingness of courts to suppress fruits of electronic surveillance for failure to exhaust alternative investigative means. *Lilla*, however, involved a purchase

---

11. *See* Tr. at 63.

12. The affidavits are annexed to a letter from Jeffrey Lichtman, Esq., to the Court dated March 16, 1995.

13. The affidavit is annexed to a letter from Assistant U.S. Attorney George A. Stamboulidis to the Court dated March 27, 1995.

of a small amount of narcotics by an informant who dealt directly with the defendant and was accompanied by an undercover officer at the time of the purchase. On the facts presented, the court concluded that the government had failed to demonstrate that normal investigative techniques were unlikely to be successful.

The facts presented here are readily distinguishable from those in *Lilla*. There is no indication in this case that officers working in undercover capacities have engaged in any criminal transactions or conversations with the Orenas or their associates. Similarly, there is no basis to believe that the government had available informants willing to testify at trial and privy to ongoing criminal conversations between the Orenas, Audino and Cascio at the time of the Fanning affidavit. The facts presented here are much closer to those involved in *United States v. Gotti*, 771 F.Supp. at 546, in which the court upheld a finding of impracticality pursuant to Section 2518(3)(c) despite the government's access to numerous informants. *See also United States v. Crozzoli*, 698 F.Supp. 430, 434 (E.D.N.Y.1988).

In sum, the electronic surveillance which the government sought to undertake in this case was intended to develop evidence about ongoing criminality by members of one faction in a violent, intense war for control of the Colombo crime family. As indicated by the reports of physical surveillance described in the Fanning affidavit, and confirmed by several of the intercepted conversations recounted in the second Fanning affidavit, the Orenas, Audino and Cascio were particularly conscious of being followed by law enforcement officers and took steps to avoid surveillance. Particularly when viewed in this context, the information presented to Judge Nickerson, none of which has been called into serious question, provided a substantial basis to conclude that normal investigative methods were not likely to be successful and that electronic surveillance was appropriate. Accordingly, defendants' motion to suppress pursuant to Section 2518(3)(c), or in the alternative for a hearing on the availability of alternative investigative means, should be denied.

### D. *Immediacy of Sealing*

■ Defendants' final challenge to the introduction of the intercepted communications is brought pursuant to Section 2518(8). This section requires immediate sealing of recordings of intercepted conversations upon the expiration of the Order authorizing electronic surveillance, or extensions of it, unless the government has presented a satisfactory explanation for the delay. A satisfactory explanation is required, however, only by a delay in sealing that goes *beyond* two days. *See, e.g., United States v. Massino*, 784 F.2d 153, 156 (2d Cir.1986); *United States v. Vasquez*, 605 F.2d 1269, 1278 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). Here, it is undisputed that the recordings made pursuant to the original Order of authorization were sealed two days after that Order expired. Moreover, the original Order of authorization in this case was extended, and the tapes of all recorded interceptions were sealed well before the expiration of the extension Order.[14] Accordingly, no explanation is required in this case, and defendants' motion pursuant to Section 2518(8) should be denied.

### III. BEVACQUA'S MOTION TO SUPPRESS FRUITS OF ARREST

■ Defendant Paul Bevacqua was arrested on March 27, 1992 while driving in Brooklyn, New York. In connection with the arrest, law enforcement officers seized a gun, a holster and certain documents which were in Bevacqua's possession at the time. Defendant Bevacqua argues that the government lacked probable cause to stop his car and place him under arrest, and that the items seized from him pursuant to that arrest should therefore be suppressed.

A suppression hearing was held before me on March 16, 1995. At that hearing, the government presented the testimony of Federal Bureau of Investigation Special Agents

---

14. The recordings made pursuant to the renewal order extending the period of authorized electronic surveillance were sealed prior to the expiration of the order because the "bug" was discovered. *See* Gov't's Mem.Opp. Defs.' Pre–Trial Mot. at 60.

Tom Kwiatkowski and Joseph Phalen and of New York City Police Detective Christine McNulty. These law enforcement officers testified about their participation in the surveillance and arrest of Paul Bevacqua on March 27, 1992.

The evidence presented at the hearing established that there was probable cause to arrest Bevacqua for driving with a suspended license in violation of New York Vehicle and Traffic Law § 509. Agent Kwiatkowski testified that, on March 19, 1992, he obtained a report from the New York State Department of Motor Vehicles which indicated that Paul Bevacqua's driver's license had been suspended. Hg.Tr. at 11–12.[15] Detective McNulty, the arresting officer, testified that she received instructions from her supervisor to stop Bevacqua's car and place him under arrest. According to Detective McNulty, she was made aware prior to the arrest that Bevacqua was driving with a suspended license. Hg.Tr. at 75. Agent Phalen testified that he was present in an automobile with supervisors from the Federal Bureau of Investigation and the New York City Police Department when the decision to arrest Bevacqua was made. Agent Phalen stated that these supervisors determined that there was sufficient probable cause to arrest Bevacqua for driving with a suspended license. Hg.Tr. at 122.

Bevacqua, relying upon a report written by a Police Department supervisor which makes no mention of the traffic violation, contends that the arresting officers had no knowledge of his traffic violation at the time of his arrest. The overwhelming evidence presented at the hearing, however, was to the contrary, and I find that evidence to be credible.

While it is apparent that the joint FBI-NYPD surveillance and arrest of Paul Bevacqua was not undertaken for the purpose of removing an unlicensed driver from the streets of New York, the Second Circuit in *United States v. Scopo*, 19 F.3d 777 (2d Cir.1994), rejected the argument that an otherwise valid arrest for a traffic violation was rendered illegal because the arrest was a pretext for furthering the investigation of other crimes. The Court specifically held that

> where the arresting officer had probable cause to believe that a traffic violation ... was occurring in the officer's presence, and was authorized by state or municipal law to effect a custodial arrest for the particular offense, the resulting arrest will not violate the fourth amendment.

19 F.3d at 784. Accordingly, because there was ample probable cause to conclude that Bevacqua was committing a traffic violation, his arrest was lawful and his motion to suppress should be denied.

## IV. GOVERNMENT'S MOTION TO QUASH SUBPOENAS

Defendants have served several subpoenas pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure. These subpoenas fall into two general categories. First, defendants have served virtually identical subpoenas upon the Office of the United States Attorney for the Eastern District of New York, the Federal Bureau of Investigation, the Nassau County Police Department, the Suffolk County Police Department, and the New York State Organized Crime Task Force. These subpoenas seek production of logs, photographs and other documents reflecting surveillance by these law enforcement agencies of the defendants and seven enumerated locations from March 1, 1991 through December 31, 1993. *See* Defs.' Mem.Opp.Gov't's Mot. to Quash, Ex. A. Second, defendant Petrizzo has served a subpoena seeking documents from Richard Meltsner, an accountant who apparently prepared tax returns for Carmine Sessa and his family. Sessa is expected to testify for the government at trial. The government has filed a motion to quash directed to each of these subpoenas.

### A. *The Law Enforcement Subpoenas*

 Discovery in criminal cases is governed by Rule 16 of the Federal Rules of Criminal Procedure. With the exception of those documents specifically enumerated in Rule 16(a)(1), Rule 16(a)(2) prohibits

---

**15.** References are to the transcript of the suppression hearing held on March 16, 1995.

discovery or inspection of reports, memoranda or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case.

A defendant may not obtain through Rule 17(c) documents which are protected from disclosure pursuant to Rule 16(a)(2). *See, e.g., United States v. Cherry,* 1995 WL 78022 (S.D.N.Y.1995) (discussing how Rule 16(a)(2) embodies the principles underlying the work product doctrine). Accordingly, the government's motion to quash subpoenas directed at the Office of the United States Attorney and the Federal Bureau of Investigation is granted.

The government acknowledges that the bar to disclosure in Rule 16(a)(2) does not apply to the documents sought from the remaining law enforcement agencies served with subpoenas because these agencies were not part of the investigation or prosecution of this case, and because the government has not reviewed the files of these agencies for purposes of Rule 16 discovery.[16] The government contends, however, that these subpoenas should nevertheless be quashed because they seek documents which are not subject to production pursuant to Rule 17(c) and are protected by the law enforcement privilege.

■ The government asserts that the subpoenas in issue are not proper under Rule 17(c) because the documents they seek are irrelevant and would be held inadmissible at trial, and because the production sought is overbroad. It is not the purpose of Rule 17(c) to facilitate discovery. *United States v. Gel Spice,* 601 F.Supp. 1214, 1224 (E.D.N.Y. 1985). Rather, a party seeking to compel the production of documents prior to trial pursuant to this rule must establish the following:

(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to

obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*United States v. Nixon,* 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974).

■ The indictment in this case charges the defendants with participating in a "war" for control of the Colombo organized crime family, and describes the war in paragraph twelve as follows:

By June, 1991, a split between Persico and [Victor J.] Orena had escalated into an internal war for control of the Colombo family. The war was between two factions. One was aligned with the imprisoned Persico and the other with Orena. Each faction formed armed "hit teams" to monitor the movements of the other faction and to assassinate its members and associates. The hit teams used a variety of firearms to carry out numerous assassinations and assassination attempts.

Defendants seek surveillance reports essentially to establish that their conduct was not consistent with active participation in the "war" described in the indictment.

To support its argument that such surveillance reports, if they exist, would be irrelevant, the government correctly points out that, generally, "[a] defendant may not seek to establish his innocence ... through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa,* 897 F.2d 63, 70 (2d Cir.), *cert. denied,* 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990). *See also United States v. Gambino,* 818 F.Supp. 541, 552 (E.D.N.Y.1993). The nature of the indictment in this case, however, is exceptional. The government charges the defendants with active participation in a violent "war" characterized by several murders and attempted murders. The government alleges that the defendants formed "hit teams" for the purpose of killing Persico faction members, while they themselves were being pursued by rival assassination squads. If these allegations are true, it is likely that defendants' conduct would be affected at all times

---

**16.** *See* letter from the Government to the Court dated March 22, 1995 at 2.

during the course of the war. Defendants do not seek to prove that they are not drug dealers, for example, because, on a given occasion, they were not participating in a narcotics transaction; rather, defendants presumably seek to demonstrate that they were not soldiers in an ongoing war by showing that their behavior was not characteristic of one seeking to wage a murderous war while himself a target of a "hit team." Accordingly, I conclude that the holdings in *Scarpa* and *Gambino* are not controlling, and that the documents sought are, with the exceptions noted below, relevant.

Defendants seek surveillance reports reflecting not only observations of themselves, but also of seven identified locations. Nowhere do defendants explain the relevance of observations that they were not present at these locations. (Observations that the defendants were present would, of course, be covered by a request for all observations of the defendants themselves.) Accordingly, I conclude that the documents pertaining to surveillance of the defendants themselves are relevant, but that the request for documents reflecting surveillance of locations should be quashed.

■ The government next contends that the surveillance reports are hearsay and would be inadmissible at trial. Although it is difficult to predict in advance of trial which documents will be held admissible, defendants correctly point out that surveillance reports are at least potentially admissible pursuant to Rule 803(5) of the Federal Rules of Evidence as recorded recollection and arguably pursuant to Rule 803(6). *See United States v. Myers,* 847 F.2d 1408, 1412 (9th Cir.1988). The surveillance reports sought might also form the basis for eliciting certain testimony at trial. Accordingly, I conclude that defendants have established that the documents they seek are "evidentiary" as required by *Nixon.*

■ The government next argues that the documents sought by defendants are not sufficiently specified, and that defendants are merely "fishing." The prosecution contends that defendants should be required to specify specific places and times when they were engaged in conduct which they seek to prove at trial. This is an unreasonable burden to place on the defendants. The indictment charges that the defendants participated in a conspiracy to murder from June of 1991 until late 1993. Defendants cannot reasonably be expected to recall where they were and when, much less to be aware of when they were under surveillance, throughout such a lengthy period. Moreover, for the reasons discussed above, defendants presumably contend that their behavior throughout this period, and not merely on specific occasions, was inconsistent with actively waging a war. For these reasons, defendants' request for these documents is not a mere "fishing expedition."

■ Finally, the government asserts that defendants' subpoenas seek information subject to the law enforcement privilege. To the extent compliance would reveal the names or addresses of law enforcement officers, identify undercover surveillance vehicles, or disclose law enforcement techniques and procedures, the government's position is well-taken. The subpoenas will be enforced only to the extent that they call for production of surveillance reports and photographs reflecting observations of the defendants. These reports may be redacted prior to production to exclude information in the privileged categories enumerated above. With respect to all other documents sought, the government's motion to quash is granted.[17] In the event defendants obtain production of surveillance reports which they contend are helpful to their case, they may apply to the Court for assistance, if necessary, in determining the identity of the officers who conducted the surveillance, so that they may be served with subpoenas calling upon them to testify at trial.

---

**17.** By letter dated March 22, 1995, at p. 2, n. 2, submitted after oral argument, the government states that the New York State Organized Crime Task Force wishes to be heard on its own behalf in support of the motion to quash, and asks the court to set a briefing schedule. In its original memorandum of law at p. 5, however, the government represents that the Task Force asked the United States Attorney to move to quash on its behalf. Accordingly, the request of the Task Force to relitigate this matter after it has been fully briefed and argued is denied.

## B. *The Meltsner Subpoena*

As noted above, Defendant Petrizzo has served a subpoena on Richard Meltsner, an accountant who performed work for Carmine Sessa. Although Petrizzo originally sought to have Meltsner produce ten years of tax returns and related documents prior to trial, Petrizzo has since agreed to modify his demand. For reasons stated during oral argument, Petrizzo now seeks production of tax returns and related documents filed during the six years prior to April 1, 1993, and agrees that these records should be produced if and when Carmine Sessa is called to testify for the prosecution. *See* Tr. at 13, 17–19.

■ As a preliminary matter, Petrizzo challenges the government's standing to move to quash the Meltsner subpoena. Because the subpoena might have the effect of unduly lengthening the trial and, although directed to Mr. Meltsner, of unduly harassing Carmine Sessa and his family, the government does have standing to bring this motion. *See United States v. Giampa,* 1992 WL 296440 (S.D.N.Y.1992).

■ The government argues that, because extrinsic evidence is not admissible for purposes of impeachment, the documents sought are not evidentiary as *Nixon* requires. To the extent Petrizzo seeks to use the subpoenaed tax returns as evidence of prior criminal acts by Sessa, Federal Rule of Evidence 608(b) would likely bar their admission. In a prior trial, however, similar documents were admitted. *See* Tr. at 11, 14. Moreover, Petrizzo contends that the documents he seeks may reflect financial transactions conducted by Sessa in preparation for his decision to cooperate with the government, and that these documents may therefore illuminate the factors which led Sessa to become a prosecution witness and the benefits he obtained by doing so. *See* Tr. at 11. *See also United States v. Giampa* 1992 WL 296440 (S.D.N.Y.1992) (denying motion to quash subpoena seeking financial documents from prosecution witness, but modifying subpoena to make it returnable on the first day of trial). Accordingly, the "evidentiary" prong of *Nixon* has been satisfied.

For these reasons, and in light of the modifications to the subpoena agreed to by Petrizzo during oral argument, the government's motion to quash is denied.

## CONCLUSION

For the reasons stated above, I respectfully recommend that defendant Thomas Petrizzo's motion for a taint hearing be denied, that the motion of defendants Victor M. Orena, John T. Orena, Vincent Cascio and Joseph Audino to suppress intercepted oral communications or for a hearing on alternative investigative means be denied, and that defendant Paul Bevacqua's motion to suppress be denied. I also hold that, subject to the modifications described above, the government's motion to quash subpoenas served pursuant to Rule 17(c) is hereby denied.

Any objections to the recommendations or appeal from the rulings made in this report must be filed with the Honorable Edward R. Korman within ten days of receiving this report and recommendation and Order and in any event no later than April 14, 1995. Failure to file timely objections to these recommendations may waive the right to appeal the subsequent District Court order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989).

Dated: Brooklyn, New York
March 31, 1995